23CA1001 Peo v Fenstermacher 06-04-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1001
Moffat County District Court No. 21CR6
Honorable Sandra H. Gardner, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Murray A. Fenstermacher,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE KUHN
Fox and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney
General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kevin M. Whitfield, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Murray A. Fenstermacher, appeals his judgment of conviction for possession of a controlled substance with intent to distribute, a controlled substance special offender sentence enhancer, and possession of drug paraphernalia.  We affirm in part, vacate in part, and remand with directions.

## I.     Background

¶ 2     Fenstermacher owned, operated, and resided in a vehicle repair shop.  Three informants reported to law enforcement that Fenstermacher dealt methamphetamine from the shop.  Police officers executed a search warrant and searched the shop, seizing (among other items) methamphetamine, drug paraphernalia, several firearms, and Fenstermacher's cell phone.  Fenstermacher was arrested and subsequently charged with seven counts (four of which were later dismissed).

¶ 3     The informants also reported that Fenstermacher was involved in the commissions of burglary, robbery, assaults, and menacing. Fenstermacher was charged for those activities in a separate criminal matter that trailed this case (the burglary case).[1]

---

[1] Following the conviction in this case, the trial court granted the prosecution's motion to dismiss the burglary case.

1

¶ 4    Despite extensive efforts by the trial court, this case took several years to bring to trial.  During that time, Fenstermacher was consistently uncooperative and argumentative.  He eventually proceeded to trial pro se.

¶ 5    The jury found Fenstermacher guilty of possession with intent to sell or distribute a schedule II controlled substance, a controlled substance special offender sentence enhancer, and possession of drug paraphernalia.  *See* § 18-18-405(1)(a), (2)(b)(I)(B), C.R.S. 2025; § 18-18-407(1)(d)(II), C.R.S. 2025; § 18-18-428(1), C.R.S. 2025.  The trial court sentenced him to a controlling term of twenty years in the custody of the Department of Corrections.

¶ 6    Fenstermacher now appeals, contending that the trial court erred by (1) finding that he implicitly waived his right to counsel; (2) not finding that state actors had destroyed exculpatory evidence; (3) finding that the search warrant affidavit supported probable cause; (4) denying two motions to continue the trial; (5) permitting prosecutorial misconduct; and (6) providing an improper reasonable doubt jury instruction.  He further contends that (7) the prosecution presented insufficient evidence to support the special offender sentence enhancer.

2

¶ 7     We address each issue in turn, along with a correction to the mittimus.

## II.     Waiver of Right to Counsel

¶ 8     Fenstermacher contends that he did not implicitly waive his right to counsel through his contumacious conduct when he requested a third appointment of counsel.  We are not persuaded.

### A.     Additional Facts

¶ 9     At the start of the initially scheduled trial, the trial court allowed Fenstermacher's first appointed counsel to withdraw because Fenstermacher had physically threatened him. Fenstermacher claimed that a conflict arose over counsel being unable to obtain what Fenstermacher alleged were exculpatory text messages from his seized cell phone, which had become locked when law enforcement attempted to extract its data.  *See infra* Part III.B.  The court continued the trial and indicated that although it had previously given Fenstermacher an advisement under *People v. Arguello*, 772 P.2d 87 (Colo. 1989), it would wait until after plea negotiations to do so again.  Fenstermacher then proceeded pro se and engaged in plea negotiations.

¶ 10    After the parties failed to reach a plea agreement, the trial court provided Fenstermacher with his second *Arguello* advisement. Fenstermacher then agreed to a second appointment of counsel.

¶ 11    At a later pretrial hearing, the court advised Fenstermacher of the charges and sentences he faced.  At the second appointed counsel's request, the court sealed the hearing, and counsel advised the court that Fenstermacher had threatened her with litigation. Fenstermacher alleged that counsel had misled him by not conducting additional investigations to recover the text messages from his cell phone.  Counsel represented to the court that, despite a thorough investigation, she could not obtain the text messages on the cell phone, and she had made that clear to Fenstermacher.  She stated that, based on her experience and evaluation of the strengths and weaknesses of the case, she had strongly urged Fenstermacher to take a disposition.

¶ 12    The court then provided a partial new *Arguello* advisement, although Fenstermacher interrupted it.  Ultimately, Fenstermacher requested that the second appointed counsel be permitted to withdraw.  Fenstermacher stated that he was going to attempt to hire private pro bono counsel, something he had represented to the

court in the past. The court warned Fenstermacher of the "great perils" in discharging his second appointed counsel because he would likely have to proceed to trial pro se.

¶ 13 The trial court then found that Fenstermacher had created a conflict by threatening his second appointed counsel because he was not satisfied with her investigation or advice. The court concluded that Fenstermacher did not have a well-founded reason to believe that his second appointed counsel could not competently represent him. Although Fenstermacher expressed reservations about acting pro se, the court ruled that there was not a complete breakdown in communication and a new substitution of counsel was not warranted because it would lead to the same results "at some point down the road."

¶ 14 The court accordingly presented Fenstermacher with the choice to continue with appointed counsel or proceed pro se. Although Fenstermacher avoided answering the question directly, the court reiterated the choice multiple times. In the end, the court found that Fenstermacher's refusal to work with appointed counsel without good cause constituted an implied voluntary waiver of his right to counsel.

¶ 15    The Sixth Amendment to the United States Constitution guarantees criminal defendants the fundamental right to counsel. *People v. Lavadie*, 2021 CO 42, ¶ 23.  While it also implies a right to self-representation, a defendant may only proceed pro se if he first waives his right to counsel.  *Id.* at ¶¶ 23, 25.  To be valid, a waiver must be made voluntarily, knowingly, and intelligently.  *Id.* at ¶ 26.

¶ 16    "A defendant's lack of good faith in working with appointed counsel, including an unreasonable refusal to cooperate with counsel or an unreasonable request for substitution of appointed counsel, can be the first step toward waiver of counsel."  *Arguello*, 772 P.2d at 94.  "Once the trial court appropriately has determined that a substitution of counsel is not warranted, the court can insist that the defendant choose between continued representation by existing counsel and appearing pro se."  *Id.*  The defendant then effects a voluntary waiver if the defendant refuses without good cause to proceed with existing appointed counsel.  *Id.*

¶ 17    Even though an implied waiver is voluntary, the trial court must also ensure that the defendant made the waiver knowingly and intelligently.  *Id.*  This means the record must clearly show that

6

"the defendant understood the nature of the charges, the statutory offenses included within them, the range of allowable punishments, the possible defenses to the charges and circumstances in their mitigation, and all other facts essential to a broad understanding of the whole matter." *Lavadie*, ¶ 28.

¶ 18 We review the validity of a waiver as a mixed question of fact and law. *Id.* at ¶ 22. We accept the trial court's factual findings if they are supported by competent evidence in the record, but we analyze de novo the facts' legal significance. *Id.*

¶ 19 In assessing the validity of a waiver, we must "indulge every reasonable presumption against finding a waiver of the right to counsel." *Id.* at ¶ 29. We do not only examine the trial court's advisement; we also apply a "flexible, totality-of-the-circumstances test to determine if a defendant has validly waived his right to counsel." *Id.* at ¶ 43.

### C. Fenstermacher Implicitly Waived His Right to Counsel

¶ 20 Fenstermacher argues that he did not implicitly waive his right to counsel because the waiver was not voluntary and he did not act knowingly or intelligently.

¶ 21    Specifically, Fenstermacher asserts that the waiver of his right to counsel was not voluntary because there was an irreconcilable breakdown with appointed counsel due to her inability to obtain the allegedly exculpatory cell phone data.  The court then showed, so Fenstermacher claims, an unwillingness to inquire into his desire to obtain new counsel who would acquire the cell phone data.  These actions purportedly violated Fenstermacher's rights by forcing him to choose between his right to counsel and his good faith attempt to present a defense based on the cell phone data.

¶ 22    But Fenstermacher's argument ignores crucial details from the proceedings.  Considering the totality of the circumstances, the record clearly shows that Fenstermacher's discord with his counsel stemmed from his unreasonable animosity.  *See Arguello*, 772 P.2d at 94.  Fenstermacher's conflicts with his lawyers didn't arise from irreconcilable differences.  Both conflicts with his appointed counsel arose from Fenstermacher threatening each of them — either physically or with litigation.  It's difficult to conceive of conduct more uncooperative and unreasonable than threatening one's own counsel.  *See People in Interest of B.H.*, 2021 CO 39, ¶ 74 ("Threatening to kill one court-appointed lawyer and then failing to

8

cooperate with the replacement is clearly inconsistent with asserting the right to appointed counsel.").

¶ 23 Furthermore, the trial court found, and the record supports, that both appointed lawyers had attempted to obtain the cell phone data that Fenstermacher sought. *See infra* Part III.B. Indeed, the second appointed counsel informed the trial court that in thirty years she had never had an investigator do more investigating for a single defendant than the investigator had done for Fenstermacher.

¶ 24 Accordingly, the record supports the trial court's finding that Fenstermacher merely disliked his second appointed counsel's advice and inability to secure unobtainable evidence. This does not constitute an irrevocable breakdown over his choice of defense. *See People v. Hodges*, 134 P.3d 419, 425 (Colo. App. 2005) ("Neither the existence of animosity between [the] defendant and [counsel] nor [counsel's] asserted disagreement with [the] defendant regarding the strength of [the] defendant's case constitutes an actual conflict of interest requiring the appointment of substitute counsel."), *aff'd on other grounds*, 158 P.3d 922 (Colo. 2007).

¶ 25 It follows that Fenstermacher's conduct warranted the trial court pressing him to choose between continuing with existing

counsel or proceeding pro se. *See Arguello*, 772 P.2d at 94. Because the choice was warranted, he was not unduly compelled. *Cf. Lavadie*, ¶ 27 ("A waiver is voluntary if it is 'not extracted by threats or violence, promises, or undue influence.' (quoting *People v. Davis*, 2015 CO 36M, ¶ 18)). Therefore, Fenstermacher's lack of good faith and refusal to continue working with his appointed counsel supports the trial court's conclusion that he effected an implied, voluntary waiver of his right to counsel. *See Arguello*, 772 P.2d at 94.

¶ 26     Fenstermacher next argues that he did not knowingly and intelligently waive his right because he believed that if he could not retain private counsel, then the court would appoint him new counsel.

¶ 27     The record shows that, over the course of three *Arguello* advisements, Fenstermacher affirmed multiple times that he understood the nature of the charges, the statutory offenses, the range of punishments, the possible defenses, and all other essential facts to the case. *See Lavadie*, ¶ 28. What is more, during the sealed hearing, the trial court (1) warned Fenstermacher of the "great perils" of proceeding pro se; (2) made clear findings that

substitution of counsel wasn't warranted; (3) advised him that he likely would not later receive substitute counsel; and (4) noted that he had not yet hired private counsel despite having said he was going to do so. The trial court thus ensured that Fenstermacher had "a broad understanding of the whole matter." *Id.* His later professed confusion over the trial proceedings is refuted by the record, which shows that the court made him fully aware that his waiver was not conditioned on the acquisition of private counsel. *See People v. Wilson*, 397 P.3d 1090, 1095 (Colo. App. 2011) ("Once a defendant validly waives his right to counsel, he has no unconditional right to withdraw the waiver."), *aff'd*, 2015 CO 37; *People v. Romero*, 694 P.2d 1256, 1264 (Colo. 1985) ("[A]n accused's legal knowledge is not relevant to an assessment of whether his exercise of the right to defend himself is knowingly made . . . .").[2]

---

[2] We decline to address Fenstermacher's conclusory assertion that the court failed to inquire into his mental state under *Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008) ("[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is *mentally competent* to do so." (emphasis added)). This is because Fenstermacher fails to develop this argument or explain how his competency was at issue. *See People v. Liggett*, 2021 COA 51, ¶ 53, *aff'd*, 2023 CO 22.

¶ 28    In sum, the totality of the circumstances supports that Fenstermacher implicitly waived his right to counsel voluntarily, knowingly, and intelligently.

### III.    Destruction of Evidence

¶ 29    Fenstermacher contends that his right to due process was violated because a state actor effectively destroyed text messages contained on his cell phone.  He alleges that law enforcement caused the cell phone to lock, which prevented him from accessing the text messages.[3]  We are not convinced.

### A.    Standard of Review and Applicable Law

¶ 30    We review de novo whether the State violated a defendant's due process rights.  *People v. Eason*, 2022 COA 54, ¶ 40.

¶ 31    "The Due Process Clause of the Fourteenth Amendment mandates that the [S]tate disclose to criminal defendants favorable evidence that is material to either guilt or punishment."  *People v. Braunthal*, 31 P.3d 167, 172 (Colo. 2001).  "To establish a due

---

[3] We reject the People's contention that this issue was not preserved.  Although Fenstermacher did not file a formal motion, he brought the issue to the trial court's attention numerous times, and the prosecution raised and presented testimony on the issue during a motions hearing, giving the trial court an adequate opportunity to rule on the matter.  *See Martinez v. People*, 2015 CO 16, ¶ 14.

12

process violation based on the [S]tate's failure to preserve potentially exculpatory evidence, the defendant 'must prove that the evidence was suppressed or destroyed by state action and that the evidence was material.'" *Eason*, ¶ 37 (quoting *Braunthal*, 31 P.3d at 172). "More specifically, the defendant ordinarily must show that (1) the [S]tate suppressed or destroyed the evidence; (2) the evidence had an exculpatory value that was apparent before it was destroyed; and (3) [the defendant] was unable to obtain comparable evidence by other reasonably available means." *Id.*

¶ 32    Exculpatory evidence means evidence that is material, and "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Lowe*, 2020 COA 116, ¶ 10 (quoting *People v. White*, 64 P.3d 864, 874 (Colo. App. 2002)). "If, however, the evidence in question wasn't apparently exculpatory, but only potentially useful, a defendant alternatively establishes a due process violation [by showing] that the [S]tate suppressed or destroyed the evidence in bad faith." *Eason*, ¶ 38.

## B. Additional Facts

¶ 33    Acting under the search warrant, police officers seized Fenstermacher's cell phone during their search of his shop. A forensic examiner partially extracted data from the cell phone; that data was disclosed to Fenstermacher. Yet the extraction failed to obtain all the cell phone's data, including certain text messages, and the phone became locked during the forensic process.

¶ 34    Fenstermacher then moved for the return of the cell phone so that he could attempt to access the text messages, which he contended were exculpatory. The prosecution objected because the cell phone was potential evidence.

¶ 35    Fenstermacher's first appointed counsel represented to the trial court that on two occasions he met with a police technician and unsuccessfully attempted to view the text messages. Although counsel represented that law enforcement and the prosecution had "been very helpful" with counsel's attempts to access the text messages, the cell phone remained locked, and Fenstermacher required the cell phone so that he could try to unlock it with the aid of Apple Support.

¶ 36     The trial court denied the motion to return the cell phone but allowed Fenstermacher and counsel to attempt to access the phone under law enforcement's supervision. The two then met with law enforcement and tried to unlock the cell phone for roughly an hour to no avail.

¶ 37     Later, counsel told the trial court that he was working on "being able to access the information on the Cloud." But when the issue next arose, Fenstermacher — by then pro se — said that he needed a court order before his cell phone provider would grant him access to his cell phone's records. He didn't follow up with a motion for such an order.

¶ 38     Thereafter, at a motions hearing, the prosecution raised the issue to clarify the record. The prosecutor presented witness testimony recounting Fenstermacher's attempt to access the phone, briefly explained how the phone became locked, and summarily recounted what data was successfully recovered. The prosecutor then stipulated that he wouldn't use anything obtained from the phone in his case-in-chief. Based on that stipulation, the court ordered that the prosecution could not present the recovered cell phone data at trial.

¶ 39    At the end of the trial, after the jury was sent to deliberate, Fenstermacher requested to make a further record about the cell phone.  He alleged that he could download the text messages if allowed to charge and reset his cell phone.  Although Fenstermacher had previously made numerous general claims about the content of the text messages, the court allowed Fenstermacher to make a final, detailed offer of proof about what the text messages contained.

¶ 40    In his offer of proof, Fenstermacher said that the text messages revealed information about the informants who were victims in the burglary case and provided the basis for the search warrant.  These claims against the informants involved, among many other things, the following: lying about burglary; engaging in credit card theft; paying $600 for a car title; molesting, robbing, and date-raping various victims; refusing to move out of the shop; stealing $7,000; stealing cars; using an extendable baton; stealing moving boxes; failing to pick up a flag; and embezzling $80,000.

¶ 41    The trial court found that, based on the offer of proof, the text messages had no bearing on the methamphetamine-related charges in this case.

## C. The Cell Phone Did Not Have Apparent Exculpatory Value

¶ 42    We begin by analyzing the apparent exculpatory value of the cell phone data and text messages because if the evidence was not apparently exculpatory, we need not address whether the cell phone data or text messages were destroyed or whether there were other means to obtain the text messages or other cell phone data. *See Braunthal*, 31 P.3d at 175 ("[A]ll three prongs of the [destruction of evidence test] must be satisfied in order for [the defendant] to establish a due process violation.").

¶ 43    Fenstermacher asserts that the exculpatory value of the cell phone was apparent because the search warrant sought the cell phone to uncover inculpatory evidence. In other words, according to Fenstermacher, because law enforcement thought that the cell phone had potentially inculpatory data, it must have thought that the cell phone also had potentially exculpatory data.

¶ 44    It is fatal to Fenstermacher's contention that the search warrant merely indicated that law enforcement suspected that the cell phone had *potentially relevant* evidence. Fenstermacher does not point to any fact suggesting that the cell phone clearly held

17

relevant or exculpatory data. And the search warrant did not indicate that law enforcement reasonably foresaw that the cell phone necessarily contained material evidence, inculpatory or exculpatory. *Cf. id.* at 172 (holding that the prosecution's duty to preserve evidence applies "[w]hen it is reasonably foreseeable that evidence may be favorable to the accused"). As indicated, the warrant established only that the evidence sought was potentially relevant, and *potentially relevant* evidence is clearly distinct from *apparently useful* evidence, which is itself distinct from *apparently exculpatory* evidence. *See Eason*, ¶ 48 (holding that speculative and conclusory assertions are insufficient to establish apparent exculpatory value); *cf. Braunthal*, 31 P.3d at 172 ("[T]he prosecution's duty to prevent the loss or destruction of evidence that may be favorable to the defendant is not absolute.").

¶ 45    We further reject Fenstermacher's assertion that his offer of proof (as well as his other claims) about the text messages demonstrated that the data had apparent exculpatory value. First, his offer of proof and other claims were presented after the cell phone became locked, thus having no bearing on what would have been apparent to law enforcement "*before* [the evidence] was

destroyed." *Eason*, ¶ 37 (emphasis added). Second, his offer of proof demonstrated that the text messages related to the motivations and actions of the informants in the burglary case. Such factors were irrelevant to the material issues at trial, as the informants weren't expected to be (and in fact weren't) called as witnesses by the prosecution. *Cf. id.* at ¶ 48 ("[E]xculpatory evidence includes evidence which bears on the credibility of a witness the prosecution intends to call at a trial." (alteration in original) (quoting *Braunthal*, 31 P.3d at 174)).

¶ 46 Fenstermacher alternatively argues that, even if the data's exculpatory value was not apparent, his due process rights were violated because the State acted in bad faith by preventing him from accessing the text messages. According to Fenstermacher, the prosecutor and law enforcement officers deliberately gave him less time than they knew he would need to unlock the cell phone and access the text messages.

¶ 47 To the contrary, Fenstermacher does not direct us to evidence showing that the phone was deliberately locked in bad faith. The testimony at the motions hearing demonstrated that the cell phone locked during the data extraction for unknown reasons, and the

prosecutor disclosed the information law enforcement was able to extract. This evinces an "imperfect collection of evidence, not the destruction thereof." *People v. Casias*, 59 P.3d 853, 856 (Colo. 2002).

¶ 48    Further, Fenstermacher's argument is contradicted by the following facts, which show that he was provided with several opportunities to attempt to unlock the phone:

- His first appointed counsel was afforded at least three separate opportunities to access the cell phone.

- Law enforcement provided Fenstermacher with full access to the cell phone for an hour so that he and his counsel could make several attempts to access the text messages.

- Fenstermacher's counsel said that the prosecution and law enforcement had been "very helpful" in assisting with the attempts to unlock the phone.

This record demonstrates that the State, in good faith, provided Fenstermacher with opportunities to unlock the cell phone. That the State couldn't provide Fenstermacher with an unlimited amount of time to continue his efforts does not demonstrate otherwise. *Cf.*

*Eason*, ¶ 52 (holding that inadvertent, not willful, destruction of evidence did not support finding bad faith).

¶ 49   Because the cell phone had no apparent exculpatory value and Fenstermacher has not shown that the State acted in bad faith, Fenstermacher's due process challenge fails.  *See id.* at ¶¶ 37-38.

## IV.   Search Warrant

¶ 50   Fenstermacher contends that the search warrant lacked probable cause because the affidavit for the warrant relied on stale information regarding drug activity.  We disagree.

### A.   Standard of Review and Applicable Law

¶ 51   "The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures."  *People v. Cox,* 2018 CO 88, ¶ 7.  "Under both constitutions, 'a search warrant may only be issued upon a showing of probable cause, supported by oath or affirmation, particularly describing the place to be searched and the things to be seized.'"  *Id.* (quoting *People v. Kerst,* 181 P.3d 1167, 1171 (Colo. 2008)).

¶ 52   "Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to

believe that contraband or evidence of criminal activity is located at the place to be searched." *People v. Miller*, 75 P.3d 1108, 1112 (Colo. 2003). "[L]aw enforcement's affidavit must establish a nexus between the alleged criminal activity and the place to be searched." *People v. Seymour*, 2023 CO 53, ¶ 54. The affidavit must also provide a "substantial basis" that a search would uncover evidence of a crime. *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

¶ 53    We generally give a probable cause determination "great deference." *Cox*, ¶ 10 (quoting *People v. Hebert*, 46 P.3d 473, 481 (Colo. 2002)). Our task is to assess whether the court had a "substantial basis" for issuing the search warrant, resolving any doubt in favor of the probable cause determination. *Id.* (quoting *Hebert*, 46 P.3d at 481). In doing so, we must consider "the totality of the facts and circumstances" before the court. *Seymour*, ¶ 54 (quoting *Henderson v. People*, 879 P.2d 383, 391 (Colo. 1994)).

¶ 54    The currentness or staleness of information is important to our totality of the circumstances analysis. *Miller*, 75 P.3d at 1113. "Whether the information is stale and cannot support probable cause depends on the factual circumstances and the type of crime." *Id.* "For warrants involving drug trafficking specifically, when there

is evidence 'demonstrating that the alleged drug trafficking activity was ongoing over a considerable period of time[,] . . . the passage of time between the suspected illegal activities and issuance of the warrant diminishes in significance." *People v. Cooper*, 2016 CO 73, ¶ 13 (second alteration in original) (citation omitted). Also, if an affidavit is based on a tip from an informant, we must take into account the informant's reliability and basis of knowledge. *People v. Randolph*, 4 P.3d 477, 481 (Colo. 2000).

¶ 55 When reviewing the denial of a motion to suppress, we defer to the court's factual findings and will not disturb those findings if they are supported by competent evidence in the record. *People v. Brown*, 217 P.3d 1252, 1255 (Colo. 2009). However, we review the trial court's conclusions of law de novo. *Id.*

## B. Additional Facts

¶ 56 The search warrant, which was executed in 2020, stated that three informants, one of whom had provided reliable information in the past, reported to law enforcement that between September 2 and September 11, 2020, Fenstermacher had committed the crimes at issue in the burglary case. The search warrant affidavit also contained the following reports from the informants — made

without specific dates — that criminal drug activity was taking place at Fenstermacher's shop:

- "During [an] interview[,] [two of the informants] told the [police officer] that for the last two to three weeks [Fenstermacher] and several other people that were involved in the illegal drug trade in Moffat County had been accusing [one of the informants] of stealing people's property."

- "[An informant] stated that [Fenstermacher] took his black Harley Davidson motorcycle and traded it to [an acquaintance] for methamphetamine and shortly after [Fenstermacher] began making accusations that [the informant] had been stealing property from him and other people."

- "While in the shop, [an informant] stated she saw multiple meth pipes and drug paraphernalia laying on a table in the loft . . . ."

- "[An informant] stated [Fenstermacher] has used methamphetamine in front of her on numerous occasions and she has seen methamphetamine and pipes in the shop on multiple occasions in the recent past."

- "[An informant] stated that he has seen [Fenstermacher] in possession of large quantities of methamphetamine on multiple occasions and [Fenstermacher] often hides the methamphetamine in plastic bags inside the used oil cans."

- "[An informant] stated it was common for the large garage door to be partially open when [Fenstermacher] has large quantities of illegal drugs and is actively dealing."

- "Based on prior information from other reliable confidential sources[,] [the police officer] [had] been told the [shop] is used as a front to facilitate an ongoing criminal enterprise that includes illegal drug use, possession, [and] distribution . . . ."

¶ 57 Law enforcement investigated from September 11 to September 23. They then applied for and received a search warrant on September 30. Police officers executed the search warrant on October 7, 2020.

¶ 58 Fenstermacher's second appointed counsel filed a motion to suppress the seized evidence based upon the search warrant lacking probable cause. The trial court denied the motion to

suppress, finding that the warrant was supported by sufficient probable cause and that the police had acted in good faith.

## C. The Information in the Search Warrant's Affidavit Was Not Stale

¶ 59 Fenstermacher claims that the warrant lacked probable cause because it was not executed until October 7, nearly a month after the last reported criminal activity around September 10. This delay, claims Fenstermacher, made the affidavit's information regarding drug trafficking stale, especially as the information about methamphetamine did not include specific dates.[4] We reject Fenstermacher's contention for three reasons.

¶ 60 First, contrary to Fenstermacher's view, the affidavit indicated that the drug trafficking was ongoing because Fenstermacher (1) was said to be known to traffic drugs; (2) had recently acquired methamphetamine through trade; (3) used methamphetamine and displayed methamphetamine paraphernalia on "numerous occasions"; (4) possessed large quantities of methamphetamine "on multiple occasions"; (5) "often" hid methamphetamine in the shop;

---

[4] Fenstermacher does not contest on appeal that the affidavit established a nexus between the alleged criminal activity and the place searched. *See People v. Seymour*, 2023 CO 53, ¶ 54.

and (6) frequently used the shop's garage door to signal drug dealing. These *numerous* and *multiple* occasions during which Fenstermacher was recently observed using and handling methamphetamine — done with enough regularity that Fenstermacher reportedly had a system to signal when he was actively dealing — provided a substantial basis for a reasonable officer to conclude that Fenstermacher's recent criminal drug activity had been ongoing over a considerable period, even without specified dates. *See Cooper*, ¶ 14 ("[T]he lack of specific dates does not lead us to conclude that the information was so stale that no reasonable police officer could rely on the warrant."). It follows that the passage of a month between the burglary case's criminal activities and the search was not significant to the currentness of the drug trafficking information. *See id.* at ¶ 13.

¶ 61 Second, Fenstermacher cites in support of his claim *People v. Miller*, where the supreme court determined that a warrant was invalid after an "excessive delay" of "almost a month" between the police observations and execution of the warrant. 75 P.3d at 1114-15. But *Miller* doesn't stand for the proposition that an affidavit becomes stale solely based on the passage of a month. To the

27

contrary, the supreme court in *Miller* "emphasize[d] that there is no bright line rule for counting of days in considering whether the affidavit is based on stale information." *Id.* at 1116 n.7. Indeed, the staleness in *Miller* arose from the fact that the affidavit's current information on drug manufacturing at one location didn't relate to the limited illegal activity from a month prior at another location that was the target of the search. *Id.* at 1115.

¶ 62 Distinguishable from *Miller*, the information in the affidavit here focused on the same location for both the ongoing criminal activity and the place to be searched. In such situations, "courts have held that observations dating back more than one month were not stale." *Id.* at 1116 n.7 (citing cases). Consequently, *Miller* weighs against Fenstermacher's position.

¶ 63 Third, Fenstermacher claims that the warrant lacked probable cause because the police did not corroborate the informants' statements. But considering the great deference afforded the probable cause determination, the totality of the circumstances shows that the informants were sufficiently reliable. *See Cox*, ¶ 10; *Seymour*, ¶ 54. The affidavit established that the informants based their information on personal observations; their accounts were

generally consistent; and they were able to provide specific details about the layout of the shop and Fenstermacher's drug activities — including that Fenstermacher hid the methamphetamine in oil cans. *See Randolph*, 4 P.3d at 481-82 ("The totality of the circumstances analysis also may include the depth of detail provided by the informant, as courts have inferred reliability from an informant's ability to provide details that could not be obtained easily."). And one of the informants had provided reliable information in the past that led to a successful prosecution. *See People v. McCoy*, 870 P.2d 1231, 1234 n.6 (Colo. 1994) ("Reliability of a confidential informant can be supported by showing that the informant in the past has supplied information that proved reliable."). What is more, the affidavit stated that there was some degree of corroboration achieved through the police officer's confidential sources.

¶ 64    Therefore, the warrant did not lack probable cause because the information was current and reliable, and as a result, we need not consider a good faith exception. *See People v. Gutierrez*, 222 P.3d 925, 941 (Colo. 2009) (holding that "evidence obtained in violation of the Fourth Amendment should not be suppressed in

circumstances where the evidence was obtained by officers acting in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate, even if that warrant was later determined to be invalid").

## V.    Motions to Continue

¶ 65    Fenstermacher contends that the trial court abused its discretion by denying two motions to continue the trial.  He claims that the continuances were justified because he needed more time to (1) review discovery and obtain evidence from his cell phone and (2) gather witnesses central to his defense.  We are unpersuaded.

### A.    Standard of Review and Applicable Law

¶ 66    We review a trial court's denial of a motion for a continuance for an abuse of discretion.  *People v. Rainey*, 2023 CO 14, ¶ 14.  "A trial court abuses its discretion in denying a motion to continue if, under the totality of the circumstances, its ruling is manifestly arbitrary, unreasonable, or unfair."  *People v. Garrison*, 2017 COA 107, ¶ 12 (quoting *People v. Faussett*, 2016 COA 94M, ¶ 12).

¶ 67    Our review must evaluate the circumstances at the time the motion to continue was made, particularly the reasons presented to the trial court when the request was denied.  *People v. Ahuero*, 2017

CO 90, ¶ 11. There is no mechanical test for our determination, and the trial court is given a great deal of latitude in scheduling the trial. *Id.* at ¶ 12. "Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)).

## B. Additional Facts

¶ 68 Although Fenstermacher had implicitly waived his right to counsel, the court appointed advisory counsel to assist him through trial. Four days before trial, Fenstermacher filed a motion to continue. The trial court held a sealed hearing at the start of trial to address the motion. In that hearing, Fenstermacher alleged that he lacked full access to discovery and didn't have proper knowledge of how to proceed without counsel. He also claimed he needed more time to obtain the text messages that he believed were exculpatory.

¶ 69 The trial court extensively reviewed the record regarding Fenstermacher's implied waiver of his right to counsel, his previous attempts to recover the text messages, and the court's denial of his

31

motion to suppress the search warrant. The trial court made the following findings as to why the motion to continue was unjustified:

- Fenstermacher had been out of custody for approximately six months.

- Fenstermacher had been consistently unwilling to work with court-appointed counsel.

- The prosecution opposed the continuance, was ready to proceed, and had witnesses subpoenaed.

- The case had been pending for two years and had already had multiple continuances.

- The court had a busy docket.

- Fenstermacher demonstrated an improper motive to delay by attempting to argue the evidence rather than addressing the motion to continue.

Based on the circumstances, the trial court denied the motion because there was no guarantee that any continuance would result in Fenstermacher being better prepared.

¶ 70    At trial, after Fenstermacher called all of his available witnesses, he again requested a continuance. Fenstermacher had failed to file a motion or obtain a stipulation from the prosecution to

call witnesses by Webex, and he claimed that he hadn't understood that he needed to have the witnesses subpoenaed. He noted that he had presumed that subpoenas would automatically issue based on his expected witness list. Accordingly, he moved for a continuance so that he could attempt to obtain those witnesses who had not appeared. In connection with his motion, he made an offer of proof as to the missing witnesses' testimony. The court then denied his motion to continue because it concluded that none of the testimony would be admissible.

### C. The Denials of the Motions to Continue Were Not Abuses of Discretion

¶ 71 Regarding his motion to continue prior to trial, Fenstermacher claims it was justified because it served the narrow purpose of allowing him to try to obtain the text messages.

¶ 72 We are not persuaded because the record fully supports the trial court's finding that Fenstermacher consistently demonstrated an unwillingness and inability to prepare. The case was already two years old and had been continued multiple times, affording Fenstermacher ample time to attempt to obtain the text messages — including during the six months he spent out of

custody before trial. In addition, Fenstermacher's continual argumentative and uncooperative conduct supports the trial court's finding that his motives were improper. Moreover, further delay would have prejudiced the prosecution — which was ready to proceed — and impacted the court's already busy docket. *See People v. Senette*, 2018 COA 105, ¶ 9 (holding that prejudice to the nonmoving party is a relevant factor to consider in determining whether to grant a continuance); *cf. People v. Sandoval-Candelaria*, 2014 CO 21, ¶ 26 ("[O]ur cases make clear that trial courts have broad discretion to manage their dockets."). Under such circumstances, the court's ruling was not unreasonable, arbitrary, or unfair. *See Ahuero*, ¶ 12; *Garrison*, ¶ 12.

¶ 73 Similarly, we disagree with Fenstermacher's claim that the court abused its discretion by denying his motion to continue submitted near the end of the trial.

¶ 74 Fenstermacher's claim that he didn't understand the subpoena process was not grounds for delay because he had advisory counsel to assist him with such matters. Besides, at that late point in the trial, Fenstermacher's need for more time to locate additional witnesses was not a compelling reason for a continuance,

34

given that the court found the expected testimony would have been irrelevant. *See Ahuero*, ¶ 12 (holding that the difficulties inherent in "assembling the witnesses, lawyers, and jurors at the same place at the same time . . . counsel[] against [a] continuance[] except for compelling reasons" (quoting *Morris*, 461 U.S. at 11)).

## VI.    Prosecutorial Misconduct

¶ 75    Fenstermacher contends that the prosecutor committed misconduct during closing argument by (1) referencing facts not in evidence when he directed the jury to consider Fenstermacher's actions in the courtroom and (2) denigrating Fenstermacher's pro se defense. We disagree.

### A.    Standard of Review and Applicable Law

¶ 76    A prosecutor has wide latitude to make closing arguments that are based on facts in evidence and reasonable inferences drawn from those facts, *People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009), especially when responding to a defense argument, *People v. Tran*, 2020 COA 99, ¶ 58. But the prosecutor may not misstate or misinterpret the law, refer to facts not in evidence, or denigrate the defense. *People v. McMinn*, 2013 COA 94, ¶ 62; *People v. Welsh*, 176 P.3d 781, 788 (Colo. App. 2007).

¶ 77    We use a two-step analysis to review prosecutorial misconduct claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we evaluate whether the prosecutor's conduct was improper under the totality of the circumstances. *Id.*; *see McMinn*, ¶ 60. In making this determination, we consider the language used, the strength of the evidence supporting the conviction, and the context in which the statements were made — including, among other things, asserted defenses. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1050 (Colo. 2005).

¶ 78    Second, if there was misconduct, we determine whether reversal is required under the applicable standard of review. *Wend*, 235 P.3d at 1096; *People v. Robinson*, 2019 CO 102, ¶ 18. Because Fenstermacher didn't object to the asserted misconduct at trial, we review his claim for plain error. *See Robinson*, ¶ 19. An error is plain if it so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict. *Domingo-Gomez*, 125 P.3d at 1053. In the context of prosecutorial misconduct, we will reverse for plain error only "when the misconduct was 'flagrantly, glaringly, or tremendously improper.'" *Robinson*, ¶ 19 (quoting *Domingo-Gomez*, 125 P.3d at 1053).

Consequently, prosecutorial misconduct in closing argument rarely constitutes plain error. *People v. Sauser*, 2020 COA 174, ¶ 101.

### B. Facts Not in Evidence

¶ 79 Fenstermacher asserts that the prosecutor improperly referred to facts not in evidence in the following statements that commented on Fenstermacher's questioning of witnesses:

- "We also learned that [Fenstermacher] had an intimate knowledge of everything that was located in that north loft. What do we know? *When he's having a back-and-forth colloquy with [a police officer] on the stand about the double-barrel shotgun that's inoperable, he's describing the markings on it, the rust, the way that he came into possession of it.* He knows that item in and out." (Emphasis added.)

- "*[S]prinkled throughout Mr. Fenstermacher's questioning and his witness testimony is the implication that somebody else did this.* It wasn't me; it was someone else. . . . Who knows about what's behind the false back wooden container? Murray Fenstermacher. Because why? Because I know what these guns are . . . . [W]hat else is in there? A

dangerous weapon.  [A 9mm handgun], two clips, hollow point bullets also in there.  *Murray Fenstermacher's.  Murray Fenstermacher was asking questions to try to have it both ways.*"  (Emphasis added.)

- "Is it a party place or is it not a party place?  Like what are we talking about here?  *[He asked these] [q]uestions to one of the witnesses].*  Was I a party guy?  Hesitation . . . .  People used to come over to his place and they were in a bad way.  What does that mean? What does 'in a bad way' mean?  Are they having a hard time with the drugs that they're using?  They're coming over to get help from him?"[5]  (Emphasis added.)

¶ 80     Apart from the comments regarding the shotgun, we don't perceive the prosecutor's statements as acting as "a vehicle for injecting irrelevant issues into the case."  *People v. Rodriguez*, 2021 COA 38M, ¶ 31.

---

[5] Fenstermacher did object to this statement on the grounds that "he's just sitting here putting stuff in these guys's head [sic] that was never ever said."  Fenstermacher does not argue that this objection preserved the contention he advances on appeal.

¶ 81    To begin, the prosecutor's remarks about Fenstermacher's questions *and his witness testimony* could be fairly construed as inartful "comment[s] on [Fenstermacher's] characterization of the facts and theory of the case." *People v. Webster*, 987 P.2d 836, 842 (Colo. App. 1998); *see Domingo-Gomez*, 125 P.3d at 1051 (holding that the court should give the prosecutor the benefit of the doubt where remarks are ambiguous or inartful).  And while a close call, such statements by the prosecutor fell within the wide latitude he had to respond to Fenstermacher's arguments.  *Cf. Domingo-Gomez*, 125 P.3d at 1051 (concluding that the prosecutor's inartful statements to the jury that a witness "*did not tell you the truth*" were, in context, proper comments "on reasonable inferences stemming directly from the facts in evidence during closing argument").

¶ 82    However, the prosecutor's comments on how Fenstermacher described the shotgun may have been more than merely *inartful.* *See id.*; *cf. Martinez v. People*, 244 P.3d 135, 141 (Colo. 2010) (noting that statements attacking a defendant's credibility by the defendant's mere presence are "improper because they are not based on reasonable inferences from evidence in the record").  It is

true that Fenstermacher's questions themselves are not evidence that the jury may consider. *See People v. Krueger*, 2012 COA 80, ¶ 59. But even though the questions are not evidence, the prosecutor had some leeway to respond to asserted facts that Fenstermacher's questions had injected into the case. *Cf. People v. Iversen*, 2013 COA 40, ¶ 37 ("[A] prosecutor has considerable latitude in replying to opposing counsel's argument[s].").

¶ 83 Regardless, even assuming that the prosecutor's challenged comments were improper, the remarks amounted to a few, brief statements focused on the appearance of the shotgun — not a critical issue in the case — and therefore were not flagrantly, glaringly, or tremendously improper. *See Robinson*, ¶ 19; *Domingo-Gomez*, 125 P.3d at 1053 ("Comments that were 'few in number, momentary in length, and were a very small part of a rather prosaic summation' do not warrant reversal under the plain error standard." (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982))).

## C.  Denigrating the Defense

¶ 84 Fenstermacher claims that the following statements made by the prosecutor during his closing argument denigrated

Fenstermacher's pro se defense by mimicking Fenstermacher and mocking his trial strategy and performance:

- "Well, you know, it was during COVID. People needed to come over and say hi. We're jamming up there. We're playing music. Did you see guitars and amplifiers and all this stuff? Is it a party place or is it not a party place? Like what are we talking about here? [He asked these] [q]uestions to [one of the witnesses]. Was I a party guy? Hesitation."

- "[Fenstermacher] wants you to believe that the security system is for insurance purposes, to protect people's vehicles, to protect my tools, to protect my car repair parts. Those aren't stored up in the north loft. That's not a place where you put that stuff. Okay? . . . If the purpose of those security cameras was legitimate business, there's no reason for the north loft stairs to have that camera."

- "Ladies and gentlemen, either this is the vast conspiracy; everybody's against me; [a police officer] planted that chalet container up on that shelving unit; or it is beyond a

41

reasonable doubt a thing that was happening at [the shop] up in that north loft."

- "Ladies and gentlemen, [Fenstermacher's closing argument] was a request for sympathy there. But let's please, please follow the law."

¶ 85    In context, none of these comments note Fenstermacher's pro se status, and the statements are not improper argument that there was a lack of evidence to support Fenstermacher's theory that only legitimate activities were taking place at his shop. *See People v. Gibson*, 203 P.3d 571, 577 (Colo. App. 2008) ("[T]he prosecutor is entitled to comment on the absence of evidence to support a defendant's contentions."). Moreover, the prosecutor characterizing Fenstermacher as appealing to sympathy — while also correctly encouraging the jury to follow the law — fairly responded to Fenstermacher's closing argument. *See People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004).

¶ 86    Nonetheless, Fenstermacher characterizes the prosecutor's mimicry of him as ridicule. We disagree with this proposition. Nothing in the cold record suggests that the imitations did more than present the prosecutor's version of Fenstermacher's defense.

*See Domingo-Gomez*, 125 P.3d at 1048 (holding that rhetorical flourishes fall within a prosecutor's "wide latitude in the language and presentation style used"). And Fenstermacher notably did not object to the prosecutor imitating him, supporting that the comments weren't glaringly improper. *See Robinson*, ¶ 19; *People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005) (holding that a defendant's failure to object to the conduct at issue "is a factor to be considered in examining the impact of a prosecutor's closing argument" (quoting *Wallace*, 97 P.3d at 269)).

¶ 87    Therefore, we perceive the prosecutor's comments as an attempt to draw the jury's focus to relevant evidence and not as denigrating Fenstermacher. *See People v. Allee*, 77 P.3d 831, 836 (Colo. App. 2003).

## VII.   Reasonable Doubt Instruction

¶ 88    Fenstermacher contends that the reasonable doubt jury instruction provided by the trial court lowered the prosecution's burden of proof. We are unconvinced.

¶ 89    The trial court gave the following reasonable doubt jury instruction, which was identical to the COLJI-Crim. E:03 (2022) instruction:

Every person charged with a crime is presumed innocent. This presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all the evidence, you are convinced that the defendant is guilty beyond a reasonable doubt.

The burden of proof in this case is upon the prosecution. The prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged. This burden requires more than proof that something is highly probable, but it does not require proof with absolute certainty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. *But if you think there is a real possibility that the defendant is not guilty*, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

After considering all the evidence, if you decide the prosecution has proven each of the elements of a crime charged beyond a reasonable doubt, you should find the defendant guilty of that crime.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements of a crime charged beyond a reasonable doubt, you should find the defendant not guilty of that crime.

(Emphasis added.)

¶ 90     Fenstermacher asserts that the instruction's reliance on the 2022 model instruction lowered the prosecution's burden of proof by (1) failing to inform the jury to consider the "lack of evidence" when determining reasonable doubt; (2) failing to inform the jury that reasonable doubt "would cause reasonable people to hesitate to act in matters of importance to themselves"; (3) instructing the jury that reasonable doubt requires a "real possibility that the defendant is not guilty"; and (4) framing reasonable doubt in terms of whether Fenstermacher proved a "real possibility" of his innocence.

¶ 91     For all that, at least two divisions of this court have now rejected these contentions, as Fenstermacher acknowledges. *See People v. Schlehuber*, 2025 COA 50, ¶¶ 7-34; *People v. Melara*, 2025 COA 48, ¶¶ 10-32; *see also People v. Berumen*, 2025 COA 93, ¶¶ 14-33 (recently agreeing with *Schlehuber* and *Melara* that the 2022 model instruction is an accurate statement of the law). Indeed, the division in *Schlehuber* specifically addressed the same assertions Fenstermacher makes here, holding that the COLJI-Crim. E:03 (2022) reasonable doubt instruction does not lower the burden of proof for the following reasons:

- The instruction adequately informs the jury of the prosecution's burden despite not instructing the jury to consider the "lack of evidence." *Schlehuber,* ¶¶ 21-25.

- "[S]o long as the instruction otherwise correctly defines the reasonable doubt standard," the absence of the "hesitate to act" phrase does not constitute error. *Id.* at ¶¶ 26-28.

- The "real possibility" language accurately expresses the reasonable doubt standard. *Id.* at ¶¶ 30-31; *see also Melara,* ¶ 30 (approving the real possibility language as "an accurate statement of the law").

- The "real possibility" language explains the threshold that the prosecution needs to overcome and does not shift the burden to the defendant. *Schlehuber,* ¶ 34.

For the reasons articulated by those divisions, with which we agree, we reject Fenstermacher's contention that the trial court's reasonable doubt instruction impermissibly lowered or shifted the prosecution's burden of proof. *See id.* at ¶ 35; *Melara,* ¶ 32.

VIII. Sufficiency of the Sentence Enhancer Evidence

¶ 92     Fenstermacher contends that the prosecution failed to prove the special offender sentence enhancer because there was

insufficient evidence that he had access to a firearm. We are unconvinced.

A. Standard of Review and Applicable Law

¶ 93 Irrespective of preservation, we review the record de novo to determine whether the trial evidence was sufficient to sustain the jury's verdict. *McCoy v. People*, 2019 CO 44, ¶ 27; *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). In completing this task, we must determine whether the evidence, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a rational fact finder that the defendant is guilty beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). We give the prosecution the benefit of every reasonable inference that can fairly be drawn from the evidence, so long as any inference is supported by a convincing logical connection between the facts established and the conclusion inferred. *People v. Perez*, 2016 CO 12, ¶ 25.

¶ 94 Section 18-18-407(1) governs special offender sentence enhancers for drug felonies and states that a person who commits a felony drug offense, including possession with intent to distribute, under defined aggravating circumstances commits a "level 1 drug

felony and is a special offender." In pertinent part, an aggravating

circumstance includes when

> [t]he defendant or a confederate of the
> defendant possessed a firearm, as defined in
> section 18-1-901(3)(h)[, C.R.S. 2025], to which
> the defendant or confederate had access in a
> manner that posed a risk to others or in a
> vehicle the defendant was occupying at the
> time of the commission of the violation.

§ 18-18-407(1)(d)(II).[6]

## B.     Additional Facts

¶ 95     Fenstermacher was inside his shop when law enforcement

executed the search warrant and detained him.  A police officer

testified that the shop contained "a lot" of tools.  During the search

of the shop's loft area, police officers noticed shelving and a cabinet

with paneling in front of it.  Observing an opening in the cabinet,

they "removed" or "pulled out" the paneling to reveal a concealed

compartment.  There they found a loaded SIG 9mm handgun, an

inoperable shotgun, and a Rossi .22 caliber rifle.  The handgun

appeared to be functional.  An acquaintance of Fenstermacher's

---

[6] Section 18-1-901(3)(h), C.R.S. 2025, defines firearm as "any
handgun, automatic, revolver, pistol, rifle, shotgun, or other
instrument or device capable or intended to be capable of
discharging bullets, cartridges, or other explosive charges."

48

testified at trial that the night before the search, the acquaintance had given Fenstermacher the shotgun and rifle so that Fenstermacher could help refinish them.

¶ 96    In his closing argument, the prosecutor contended that Fenstermacher could access the handgun, thus posing a risk to law enforcement, because the shop had tools that he could use to remove the concealed compartment's paneling.

### C.    Sufficient Evidence of Access to the Handgun Supported the Special Offender Finding

¶ 97    Fenstermacher contends that there was insufficient evidence to support that the handgun, as the only clearly operable firearm,[7] was immediately accessible.  This is because (1) there was insufficient evidence to show that Fenstermacher could have breached the paneling to access the handgun and (2) there was an absence of evidence of how the handgun was placed in the concealed compartment.  He claims that the only modicum of evidence suggesting that he could access the handgun was general

---

[7] The evidence indicated that the shotgun was inoperable.  There was conflicting testimony as to whether the rifle was operable.  The police also located in the loft a seemingly inoperable, antique pistol.  No black powder, balls, or caps needed to discharge the pistol were found in the loft.

testimony that there were tools in the shop. The testimony, according to Fenstermacher, was inadequate to support that the paneling could be timely removed by such tools because the testimony did not specify what the tools were or where they were located.

¶ 98    Viewing the evidence in the light most favorable to the prosecution, as we must, we disagree. *See Clark*, 232 P.3d at 1291. Evidence presented at trial established the following regarding access to the handgun:

- Fenstermacher was present in the shop.

- The shotgun and rifle were left with Fenstermacher the night before police officers searched his shop.

- At the time of the search, there was a concealed compartment in the north loft that held the loaded handgun, as well as the shotgun and rifle.

- Police officers had "removed" or "pulled out" the paneling to access the concealed compartment.

- Pictures of the concealed compartment and paneling were admitted into evidence.

From this, a reasonable juror could infer that Fenstermacher could have accessed the loaded handgun by removing the paneling and accessing the concealed compartment at the time the police searched the shop, thus posing a risk to law enforcement.[8] *See id.* at 1292.

¶ 99    Fenstermacher claims that he couldn't have easily removed the paneling, but it is not our role to reevaluate the jury's conclusion or second-guess its findings. *See People v. Arzabala,* 2012 COA 99, ¶ 13 ("An appellate court is not permitted to act as a 'thirteenth juror' and set aside a verdict because it might have drawn a different conclusion had it been the trier of fact." (citations omitted)).

¶ 100   Here, the police officers testified that they removed or pulled off the paneling without stating that they had any difficulties, and the jury was provided pictures of the paneling and the concealed

---

[8] Fenstermacher does not contest on appeal that the handgun had some nexus to the commission of the offense. *Cf. People v. Atencio,* 878 P.2d 147, 150 (Colo. App. 1994) (holding that section 18-18-407(1)(f), C.R.S. 1993, which is substantially similar to the current subsection (1)(d)(I) language, requires "some nexus between the deadly weapon and the drug offense upon which the enhanced sentence is based").

compartment. Evidence that Fenstermacher had received two of the weapons the prior evening supports the inference that he had recently accessed the compartment. All of this evidence was sufficient to allow a reasonable jury to infer that Fenstermacher was capable of immediately removing the paneling himself. *See People v. Chase*, 2013 COA 27, ¶ 50 ("If there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element."); *cf. People v. Bondurant*, 2012 COA 50, ¶ 58 ("Where reasonable minds could differ, the evidence is sufficient to sustain a conviction." (quoting *People v. Carlson*, 72 P.3d 411, 416 (Colo. App. 2003))). And even if the jury thought that tools were necessary to remove the paneling, it could have reasonably concluded that such tools were readily available according to the pictures and videos of the shop, along with testimony that "a lot" of tools were inside. *See Clark*, 232 P.3d at 1293-94 (evidence was sufficient even though it was circumstantial and conflicting).

¶ 101 Fenstermacher further argues, citing *People v. Serna-Lopez*, 2023 COA 21, that he could not have possessed the handgun

because there was no evidence showing how the handgun became concealed.

¶ 102    We disagree with the premise.  Assuming without deciding that Fenstermacher's possession and access depended on him knowing the handgun's location,[9] the evidence showed that the shotgun and rifle were left with Fenstermacher the day before the search.  As those two firearms were located in the concealed compartment by the police officers, the jury could infer that Fenstermacher placed the firearms in the compartment before the search, establishing that he knew of the compartment and its contents.  As the handgun was also in the concealed compartment, the jury could further infer that Fenstermacher also knew of and possessed the handgun by virtue of concealing it in the same hidden location — within the shop he owned and resided at — as the other firearms in his possession.  *Cf. People v. Harris*, 2016 COA 159, ¶ 67 ("[T]he prosecution is not obliged to disprove the

---

[9] We note that the special offender sentence enhancer does not require proof of a specific mental state.  *See People v. Hopper*, 284 P.3d 87, 91-92 (Colo. App. 2011); *People v. Whitaker*, 32 P.3d 511, 518 (Colo. App. 2000), *aff'd*, 48 P.3d 555 (Colo. 2002).

defendant's theories in order for the evidence to be deemed sufficient under the substantial evidence test.").

¶ 103    In sum, giving the prosecution the benefit of every reasonable inference, there was sufficient evidence to sustain the special offender sentence enhancer.

IX.    Correction to the Mittimus

¶ 104    We can correct a sentence not authorized by law at any time. Crim. P. 35(a).  As discussed *supra* Part I, the trial court sentenced Fenstermacher to a controlling term of twenty years in the custody of the Department of Corrections.  More specifically, the court sentenced Fenstermacher to twenty years on the controlled substance special offender count (count 2) and eight years on the possession with intent to sell or distribute a schedule II controlled substance count (count 1).  The court ordered these sentences to run concurrently.

¶ 105    However, "[t]rial courts may not enter a separate conviction or sentence on a count that is only a sentence enhancer." *People v. Torrez*, 2013 COA 37, ¶ 23.  And the special offender count is a sentence enhancer.  *See People v. Rios*, 43 P.3d 726, 731 (Colo. App. 2001) ("The special offender statute does not create a

substantive offense but, instead, increases the sentence for the underlying offense.").  Thus, rather than receiving a separate sentence, the special offender sentence enhancer raises the conviction for the possession count to a level 1 drug felony and establishes the range of years to which the defendant can be sentenced.  *See* § 18-18-407(1); § 18-1.3-401.5(7), C.R.S. 2025.

¶ 106  The parties agree that the trial court erred by entering a conviction and sentencing Fenstermacher on the special offender count.  The record of the sentencing hearing clearly establishes that the trial court intended that Fenstermacher serve a sentence of twenty years in prison, plus the three-year mandatory parole term.  *See Rios*, 43 P.3d at 732; § 18-1.3-401.5(2)(a).  The parties also agree on this point.

¶ 107  Accordingly, we vacate the conviction and sentence for the special offender count (count 2) and remand the case to the trial court to correct the mittimus by amending the judgment of conviction on the possession count (count 1) to reflect that it is a level 1 drug felony; this means that the trial court will apply the twenty-year sentence previously imposed for the sentence enhancer count to the possession count.  *See People v. Martinez*, 36 P.3d 201,

204-05 (Colo. App. 2001). The court should further amend the mittimus to reflect that count 2 is a sentence enhancer.

## X. Disposition

¶ 108 The conviction and sentence for the controlled substance special offender count (count 2) are vacated, and the case is remanded with directions to correct the mittimus to reflect a single twenty-year sentence for the level 1 drug felony on count 1 — possession with intent to sell or distribute a schedule II controlled substance — as directed in this opinion. The judgment of conviction is affirmed in all other respects.

JUDGE FOX and JUDGE SULLIVAN concur.